**Raizy LEVITIN, Plaintiff–Appellant,**

v.

**PAINEWEBBER, INC., Defendant–Appellee.**

**Docket No. 96–7994.**

United States Court of Appeals, Second Circuit.

Argued April 14, 1997.

Decided Sept. 29, 1998.

Roger W. Kirby, Kaufman, Malchman, Kirby & Squire, New York, NY (Mel E. Lifshitz, Bernstein Liebhard & Lifshitz, New York, NY, of counsel), for Plaintiff–Appellant.

David E. Nachman, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York, NY (Richard T. Sharp, Colin A. Underwood, of counsel), for Defendant–Appellee.

Christopher Paik, Office of Chief Litigation Counsel, Securities & Exchange Com-

mission, Washington, DC, for Amicus Curiae Securities & Exchange Commission.

Before: WINTER, Chief Judge,
FEINBERG and PARKER, Circuit Judges.

WINTER, Chief Judge.

Raizy Levitin brought this action on behalf of herself and a class of all others who engaged in short sales through accounts with PaineWebber, Inc. ("PW") after August 1992. Levitin claims that PW violated Section 10(b) of the Securities and Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and New York law when PW realized profits from collateral securing her short sale transactions and failed to inform her of those profits or to remit them to her. Judge Chin dismissed her federal claims and declined to exercise supplemental jurisdiction over her state law claims. *See Levitin v. PaineWebber, Inc.,* 933 F.Supp. 325 (S.D.N.Y.1996).

We hold that the failure to disclose profits on the posted collateral does not violate federal law because: (i) a reasonable investor would know that collateral securing short sale transactions could produce income; (ii) PW's failure to disclose profits from the use of such collateral did not constitute concealment of its misuse under state law of Levitin's property; and (iii) Levitin has not alleged any injury from PW's failure to disclose that it might negotiate with large investors remittance of some of the profits from their collateral. We therefore affirm the dismissal of Levitin's federal claims.

A. *"Short Sales"*

In 1994, Levitin signed a margin agreement and set up a trading account with PW, a registered broker-dealer. Thereafter, she engaged in a series of "short sales." "Short sale" is a term of art for well-established securities trading practices.[1] Briefly stated, a short sale involves a customer who, like Levitin, speculates that a particular stock will go down in price and seeks to profit from that drop. The transaction begins with the customer selling stock that she does not own. The customer "borrows" the stock to be sold, typically from her broker. The broker obtains the stock that it loans to the customer either from its own reserves or by borrowing it from external sources, such as other brokers or other customers. Later—sometimes considerably later—the customer "covers" the short by buying identical stock and restoring it to the broker-lender. If the price of the stock declines, as the customer hopes, the customer can purchase the stock at a lower price than the one at which she sold the borrowed stock, profiting from the difference between the sale and purchase prices.

Short sales are extremely risky. If the price of the stock increases, the customer must cover by using funds in excess of the proceeds from the sale. Because the price of a stock may increase very substantially, the potential losses associated with uncovered short sales are also very substantial.[2] Consequently, a broker who lends a customer stock for a short sale does not typically pay the proceeds of the sale to the customer to be spent when and how she wants, waiting for the customer to cover when and if it suits her. If a broker did that, the price might increase and the customer become insolvent or disappear, leaving the broker out the entire value of the stock—the price at the time of short sale plus its increase. Brokers therefore demand collateral, usually by taking an amount from the customer's account equal to the security required. The proceeds from the sale will, of course, usually be available as security, but if those proceeds and the balance in the customer's account are not sufficient to satisfy the security requirement, the customer will have to post additional collateral.

The amount of security required is not entirely a matter for negotiation between broker and customer. The collateral posted must satisfy federal margin requirements associated with short trades. For short sales

---

1. This discussion is based primarily on Levitin's complaint and her standard contract with PW.

2. In addition to bearing the risk of an adverse stock price shift, an uncovered short seller must pay to the party whose shares she borrowed any dividends that are distributed on the borrowed stock during the period that the short position is open.

of nonexempted securities, Federal Reserve Board Regulation T requires that customers meet an initial margin requirement of 150 percent of the market value of the securities being sold. *See* 12 C.F.R. § 220.12(c)(1). The New York Stock Exchange imposes separate margin requirements for short sales. *See* NYSE Rule 431(c). Adjustments in the collateral posted must be made periodically as the price of the stock fluctuates. If the stock price increases, brokers may charge the customer interest until the appropriate amount of security is restored. Of course, a broker may require particular customers to post collateral in excess of that specified by Regulation T or the NYSE.

There is one further complication. Where the broker borrows the stock from external sources, the broker must secure the loan with collateral equal to at least 100 percent of the market value of the securities borrowed. *See* Reg. T, 12 C.F.R. § 220.12(c).

Again typically, a customer's account may involve a number of different kinds of investments and the posting of collateral for some or all of them. There may also be funds in a customer's account that are not posted as collateral or otherwise committed. The broker may, or may not, offer interest on such "free balances" through money market accounts. *See* Rule 15c3–2, 17 C.F.R. § 240.15c3–2 (addressing broker obligations with respect to customer free credit balances); Norman P. Singer, SEC No–Action Letter, 1979 WL 14184 at *1 (July 12, 1979) ("Inasmuch as no NYSE or Commission rule prohibits or explicitly mandates the payment of interest on customer credit balances and monies generated from the lending of customer securities, the payment of such interest is a matter for negotiation between the customer and the broker-dealer."). Customer accounts with brokers are generally not segregated, *e.g.* in trust accounts. Rather, they are part of the general cash reserves of the broker. *See* Rule 15c3–2 (requiring periodic statements containing notice that customer funds "are not segregated and may be used in the operation of the business"). When a customer posts collateral for the borrowing of stock in a short sale, the collateral—like the balance in the account—remains part of the broker's general cash reserves and is used by the broker in transactions that it hopes will generate profits. Brokers, therefore, typically earn a return on collateral that secures a short trade or other investment.

### B. *Levitin's Complaint*

Paragraph 29 of Levitin's complaint sums up her allegations by stating that PW "borrows the customer's property, use (sic) it as it sees fit, benefits economically from such uses, and pays nothing for it." It further states that "[t]ypically, [PW] will not inform its customers of ... the interest or profits ... [PW earned] from using the customer's property." Finally, the complaint alleges that PW sometimes remits some of the money earned on collateral to "favored large customers" but does not disclose this fact to ordinary investors. Based on these allegations, Levitin asserts federal claims arising under Section 10(b) of the 1934 Act and state law claims of breach of trust, breach of fiduciary duty, breach of implied covenants of good faith and fair dealing, and violation of Article 9 of the Uniform Commercial Code ("UCC").

PW moved to dismiss on various grounds, including a failure to allege that the omissions were material, made knowingly, and were in connection with a purchase or sale of securities—all these matters being elements of a Section 10(b) violation. The district court granted the motion on the ground that the alleged violations were not in connection with the purchase or sale of securities. The court declined to exercise supplemental jurisdiction over the state law claims.

The legal theories underlying Levitin's federal claims are not clear on the face of the complaint. At oral argument, Levitin's federal claims became more defined and can be described as follows: (i) she was deceived in that she did not know that PW might earn monies from her short sale transactions in addition to the usual broker's commission, *i.e.*, monies earned on the collateral she posted; (ii) she was deceived by PW's failure to disclose that it was misappropriating her state-law property rights in the collateral and in earnings on that collateral; and (iii) she

was deceived by PW's failure to disclose that the remittance of earnings on the posted collateral was, for large favored customers, negotiable.[3] We discuss these claims in turn.

### C. Deception as to PW's Earnings from Collateral

■ Levitin claims that PW's failure to disclose earnings on the collateral she posted violated Section 10(b). To state a valid claim under that section, "plaintiffs must allege, among other things, 'material misstatements or omissions indicating an intent to deceive or defraud in connection with the purchase or sale of a security.'" *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 761 (2d Cir.1991) (quoting *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 581 (2d Cir.1990)). A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

In our view, the issue in the instant matter is not the importance of the omitted fact. Rather, it is whether a reasonable investor would be misled by PW's omission of the fact that PW earns (or may earn) money from collateral posted in short-sale transactions. The fatal flaw in this theory is derived from the principle that certain information is "so basic that any investor could be expected to know it." *Zerman v. Ball,* 735 F.2d 15, 21 (2d Cir.1984) (plaintiff assumed to have familiarity with nature of margin account); *see also Basic Inc. v. Levinson,* 485 U.S. 224, 234, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("The role of the materiality requirement is not to attribute to investors a child-like simplicity." (internal quotation marks omitted)); *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346,

351 (2d Cir.1993) (A "reasonable investor must be deemed to have some understanding of diversification and some independent view as to how much risk she is willing to undertake."); *Newman v. L.F. Rothschild, Unterberg, Towbin,* 651 F.Supp. 160, 163 (S.D.N.Y. 1986) ("[T]hat a market decline can precipitate a margin call" is a fact "so basic that any investor could be expected to know it." (internal quotation marks omitted)).

■ In the present case, the allegedly omitted fact is that PW may profit from use of the collateral posted by Levitin in a short sale transaction. However, that fact is no more than that money has a time value, and the reasonable investor simply must be held to know this. An investor who is ignorant of the fact that free cash or securities may be used to earn interest or other kinds of financial returns is simply not reasonable by any measure. Indeed, the decision to engage in short trading—or to buy common stock for that matter—is generally a decision to forgo safer interest-bearing opportunities in order to seek out higher returns, albeit at greater risk. The reasonable investor knows, therefore, that a brokerage can earn profits from funds posted with it as security for short sale transactions. Aware of the time value of money, the reasonable investor in Levitin's position also knows that the longer a short sale remains open, the more value the investor gives up by losing the opportunity to use the collateral in another way and the more profit PW can make by using the collateral.

■ Indeed, Levitin's agreement with PW stated that free credit balances in her account would automatically be invested in one or more money-market accounts bearing interest selected by her.[4] It stated further that she would have to pay interest on any amount by which the price of the shorted stock increased. There is absolutely nothing

---

**3.** At oral argument, Levitin's counsel stated that her federal claims depended upon a state-law right to any earnings on the collateral posted. If so, only (ii) is at issue. However, other statements by counsel seemed to assert theories not so dependent. We therefore address all three claims.

**4.** Although neither party in its brief addresses the substance of Levitin's contract, we may consider

documents "integral to the complaint" on a motion to dismiss—"particularly where plaintiff has been put on notice" thereof. *Cortec Inds., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991). Here, not only is Levitin's contract integral to her complaint and a document of which she has notice, but she has not objected to its inclusion in the record on appeal.

in PW's agreement with Levitin suggesting that she might expect a profit from any event but a decline in the price of the shorted stock. Far from deceiving Levitin about the earning of money on her posted collateral, the agreement indicated uses of her money—money market accounts—that would earn interest, and events—increases in the price of the shorted stock—that might cause her to owe interest. It promised profit from the short sale only if the stock price declined.[5]

Nor is there anything in industry practice that might cause Levitin to expect a return of the time value of her collateral. The practice of broker-dealers commingling funds securing short sales [6] and retaining earnings from the use of such funds is long-standing. It is mentioned in texts that are over two-generations old, *see* Charles H. Meyer, *The Law of Stockbrokers and Stock Exchanges* § 29, at 186 (1931) ("[u]sually no interest is allowed by the broker to the customer on the credit arising [from the short sale]"); Douglas Campbell, *The Law of Stockbrokers* 23 (2d ed.1922) (same), and has been the subject of SEC "no-action" letters.[7]

Indeed, the practice of a financial institution using money deposited with it to obtain earnings is neither unknown nor unexpected, much less nefarious. That is precisely how banks make money. Some bank accounts are not interest-bearing—*e.g.*, most checking accounts—even though the balances in such accounts are used by banks to earn money. Even interest-bearing bank accounts—and money market accounts with brokers for that matter—do not return to the investor the amount earned but rather pay a contractual rate. None of these routine practices is regarded as deceptive or even unusual. Indeed, Levitin might as reasonably complain of PW's failure to disclose that the interest it pays to investors on money market accounts is less than that earned by PW on the amount in the account.

Levitin, therefore, is presumed to know that money has a time value and that PW would put to income-producing use any funds of hers that secured short sales. She was promised no profit or return on those funds except for the amount of decline in value of

---

5. Indeed, appellant's contract with PW can be read as stating that interest will not be paid on the proceeds of short sales. First, under the agreement, credit balances are invested in money market funds that bear interest. *See* Resource Management Agreement ("RMA") Paragraph 2. Second, credit balances are reduced when an account-holder purchases securities or otherwise withdraws funds. Purchases of securities or withdrawals in excess of existing credit balances generate loan (debit) balances, upon which interest is charged. *See* RMA Agreement Paragraph 12.

RMA Disclosure Documents available to Levitin provide that debits and credits occurring during the course of a day are summed, and the net debit or credit balance then is summed with the previous day's ending balance to determine the new debit or credit balance for the purpose of calculating interest. *See* PW's Statement of Credit Practices (issued pursuant to Rule 10b–16 and included in the Disclosure Documents). However, the Statement of Credit Practices further provides that "[c]redit balances resulting from a short sale are disregarded because this credit balance is used to collateralize stock borrowed to make delivery against a short sale." This statement would seem to inform a reasonable' account-holder that proceeds from short sales do not off-set liabilities to PW for the purpose of calculating interest charges. Because interest charges are paid where there is a net liability owed to PW, the effect of not reducing

the liability by the amount of the short sale proceeds is that interest is not earned on such monies.

6. Levitin's contract with PW expressly permitted PW to hypothecate property, including monies and securities, in her account and to commingle her property with its own or that held for others, all without notice to Levitin. *See* RMA Agreement Paragraph 8.

7. *See* Senator Paul S. Sarbanes, SEC No–Action Letter, 1979 WL 14039 at *2 (January 22, 1979) ("[T]here is no Commission rule requiring the payment of [ ] interest [on credit balances resulting from short sales]."); Norman P. Singer, SEC No–Action Letter, 1979 WL 14184 at *1 (July 12, 1979) (same); Robert Wyman, SEC No–Action Letter, 1979 WL 14083 at *4 (June 13, 1979) ("[T]he federal securities laws do not require in every instance that a broker-dealer pass on to its customers all the various discounts and other advantages that are available to securities professionals."); *cf.* David P. Glick, Jr., SEC No–Action Letter, 1985 WL 54250 at *1 (April 5, 1985) (noting that broker-dealers may charge interest on debit balances while not paying interest on credit balances); Anna Newman, SEC No–Action Letter, 1971 WL 6731 (May 6, 1971) ("In general, it may be said that the payment or the charging of interest by a broker-dealer are matters governed by contract between the parties.").

the underlying shares. The "mix" of information afforded Levitin was thus complete.

### D. *Deception as to Misappropriation of Property*

At oral argument, Levitin advanced a legal theory based on federal law that was not clearly set out in her brief. She argued that, under New York law, the customer is either the owner of any earnings generated from collateral or such collateral is held by PW as a fiduciary for the customer. In Levitin's view, if she owned the collateral posted for the short sale or it was held in trust for her, she would be legally entitled to profits earned on it under New York law. If that is the case, PW's non-disclosure of earnings from the collateral and retention of those earnings was arguably material under Section 10b in that it failed to inform Levitin of facts that would alert her to a violation of her rights under New York law. This omission would allegedly support a federal Section 10b claim under the so-called loss of state law remedies doctrine. *See Goldberg v. Meridor,* 567 F.2d 209, 221 (2d Cir.1977); *RCM Securities Fund, Inc. v. Stanton,* 928 F.2d 1318, 1327 n. 2 (2d Cir.1991); *cf.* Scott E. Jordan, *Loss of State Claims as a Basis for Rule 10b–5 and 14A–9 Actions: The Impact of Virginia Bankshares,* 49 Bus. Law. 295, 313–14 (1993).

Levitin bases her state law ownership claims on Article 9 of the UCC, N.Y. [U.C.C.] Law § 9–207. Section 9–207(2)(c) of the UCC provides that absent a contrary agreement, profits realized from collateral while in the secured party's possession belong to the debtor. Levitin claims that Section 9–207 governs the collateral she deposited in her PW margin account. PW argues that the extensive federal regulation of short sales and margin preempt any such application of Section 9–207.[8] In our view, the analysis of whether that UCC provision applies to Levitin's transactions and of whether it is preempted overlap.

Article 9 of the UCC contains its own "reverse preemption" clause. The Article explicitly does not apply

> (a) to a security interest subject to any statute of the United States to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property.

N.Y. [U.C.C.] Law § 9–104(a). We have found little authority as to the import of Section 9–104(a) in the present context. The pertinent language is broad—"such [federal] statute governs the rights of parties to ... [secured] transactions"—and would appear easily to include the detailed federal regulations governing short sales and margin that are detailed below. It is clear, however, that Section 9–104(a) at a minimum precludes the applicability of Article 9 to transactions where its application would be preempted. Arguably, therefore, Section 9–104(a) calls for analysis more sweeping than traditional preemption analysis. Because Levitin's claim cannot survive traditional preemption analysis, we do not explore further the unfamiliar ground occupied by Section 9–104(a).

■ We first note, however, that application of preemption analysis in the present context does little harm to federalism. Quite apart from Section 9–104(a), the established practices of short sales and margin and the UCC have peacefully co-existed for years, without any perception that the UCC governed, much less outlawed, them. Levitin cites absolutely no precedent for her state-law legal challenge to industry practices regarding the posting and use of margin. The silence surrounding the relationship of the UCC to margin transactions—until this lawsuit—itself speaks volumes about the inappropriateness of applying UCC § 9–207 to those transactions.[9] We are not dealing, therefore, with a state statute that was consciously intended to regulate the transactions in question.

---

**8.** PaineWebber's argument on this point is made by reference to Merrill Lynch's brief in *Bissell v. Merrill Lynch,* 157 F.3d 138 (2d Cir.1998).

**9.** Of course, the UCC governs explicit pledgor/pledgee relationships even where the *res* pledged is a security in other respects governed by federal law. *See* UCC § 8–321 cmt. 3. No such relationship is present in the instant matter.

To the extent that the UCC did purport to apply, however, it would be preempted. Whether a state law is preempted is a matter of congressional intent. If Congress intended to exercise its constitutional authority to supersede the laws of a state, the Supremacy Clause requires courts to follow federal law. *See* U.S. Const., Art. VI, cl. 2; *Barnett Bank v. Nelson*, 517 U.S. 25, 30, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996); *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280–81, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) (reviewing preemption doctrine). If the federal laws in question do not contain explicit language regarding preemption, as in the instant case, "courts must consider whether the federal statute's structure and purpose, or nonspecific statutory language, nonetheless reveal a clear, but implicit, preemptive intent." *Barnett Bank*, 517 U.S. at 31, 116 S.Ct. 1103 (internal quotation marks omitted). Preemptive intent can be inferred: (i) where the federal statute created a scheme of federal regulation "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," *id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)); (ii) where federal law is in "irreconcilable conflict" with state law, *id.* (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982)); (iii) where compliance with both statutes is a "physical impossibility," *id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)); or (iv) where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

Federal regulation of margin transactions and broker utilization of customer funds is extensive. As a general matter, Regulation T sets forth Federal Reserve Board margin requirements, *see* 12 C.F.R. § 220 (credit by brokers and dealers), and Rule 10b–16 requires, *inter alia,* the disclosure of credit terms in margin accounts, *see* 17 C.F.R. § 240.10b–16. More significant, however, are Rules 15c2–1 and 15c3–2, each of which expressly permits broker commingling of customer funds and securities in certain situations, *see* 17 C.F.R. § 240.15c2–1 (hypothecation of customers' securities permitted with consent); 17 C.F.R. § 240.15c3–2 (commingling of customers' free credit balances permitted with notice), and Rules 15c3–1 and 15c3–3, which address broker capital and reserve requirements, *see* 17 C.F.R. § 240.15c3–1 (net capital requirements for broker dealers); 17 C.F.R. § 240.15c3–3 (requiring special reserve accounts to be set up for customer protection). The reserve requirements set forth in Rule 15c3–3 exist precisely because, as Levitin was informed, *see* Note 5, *supra,* customer funds are not segregated, but instead are at risk from commingling and hypothecation. In addition, the formula by which brokers calculate their reserve requirement obligations expressly includes customer free credit balances and the market value of short securities. *See* Rule 15c3–3a, 17 C.F.R. § 240.15c3–3a.

Short sales, too, are the subject of complex and quite technical federal regulation.[10] Briefly stated, Section 10(a) of the 1934 Act authorizes the Commission to promulgate regulations governing short sales. Such regulations were promulgated in 1938. Today, Rule 10a–1, 17 C.F.R. § 240.10a–1, sets forth general standards governing the relationship of terms of short sales and previously quoted prices, and Rule 10a–2, 17 C.F.R. § 240.10a–2, regulates the covering of short sales and prohibits naked (uncovered) transactions. In addition, the Commission has promulgated rules further regulating short sales in connection with public offerings, *see* Securities Act Rule 105, 17 C.F.R. § 242.105, and tender offers, *see* Rule 14e–4, 17 C.F.R. § 240.14e–4. Finally, Regulation T sets forth

---

**10.** In addition to the technical regulations noted, brokers are under a general duty to give customers an understandable explanation of the nature and risks of short sales. *See Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454 (9th Cir.1986). Apart from the allegations concerning the failure to disclose earnings from the posted collateral, Levitin has notably alleged no violation of this general duty.

initial margin requirements for short sales. *See* 12 C.F.R. § 220.12(c) & (d).

Levitin's argument would, if accepted, allow states to regulate the terms on which margin may be accepted by brokers as security, not only for short sales, but for all transactions on margin. Although UCC § 9–207 allows parties to depart from its rule by contrary agreement,[11] Levitin's argument in no way depends on state law being permissive in that regard. In short, her argument, if accepted, would allow a state to require that collateral be treated as the customer's property and that some form of interest be paid on that property. In light of the pervasive federal scheme governing the manner in which brokers may utilize customer securities and free credit balances, such state regulation would be in "irreconcilable conflict" with the federal regulation of margin and short sales.

First, a state law requiring customer collateral to be segregated would be in direct conflict with Rules 15c2–1 and 15c3–2, each of which permit the commingling of customer assets subject to certain consent and notice requirements, and in implicit conflict with Rule 15c3–3, which requires brokers to set up special reserve bank accounts for the exclusive benefit of customers and to maintain balances therein according to a formula, promulgated by the SEC, that specifically contemplates the commingling of customer monies and the lending of customer securities. *See* Rule 15c3–3a (setting forth formula).

Limiting Levitin's theory to short sale proceeds would not alter the analysis. As Levitin's complaint alleges, "[a] short sale is a margin transaction," and nothing in federal law suggests that the proceeds of a short sale are not subject to SEC rules on margin and commingling or are otherwise to be handled differently from other customer credit balances. In fact, there would be little sense in treating the collateral in an open short position as Levitin suggests because the customer's long securities may be hypothecated or commingled and the funds held as collateral for a short sale would in any event be subject to commingling when the short sale was covered. The protection for customers from excessive risk-taking by brokers is afforded not through segregation requirements, such as UCC § 9–207 contemplates, but through detailed federal regulations of the operation of such businesses.

Second, even if Levitin's interpretation of state law were not in direct conflict with federal rules, it would nevertheless impermissibly intrude on federal regulation of broker-dealers and of margin and short sales. Regulation by the states would directly affect the very value of security posted pursuant to federal margin requirements. A secured lender who may retain earnings on collateral has more valuable security than a lender who must remit to the customer interest on the collateral. If states may regulate as Levitin contends, the effect of federal margin requirements on particular brokers and customers would depend in part on vagaries of state law.

Her argument would also enable the states to transform customers with margin accounts from the status of general creditors to that of pledgors. Such a prohibition on the commingling of margin with brokers' cash reserves would have significant consequences. Segregated trust accounts for margin transactions, or similar devices, would have to be kept so that the appropriate amount of interest would be paid to each customer and so that creditors of the broker would not be able to reach the collateral. *See* UCC § 9–207(1). This would alter bookkeeping, the maintenance of accounts, and the methods by which brokers are compensated for transactions on margin.[12] This in

---

**11.** Arguably, Levitin's contract with PW, which permits PW to commingle her property with its own, *see* note 5, *supra*, and which provides for her earning interest in some circumstances and paying it in others while not providing for the payment of interest on collateral for short sales, *see* note 4, *supra*, constitutes just such an agreement to the contrary. Again, however, Levitin's argument is not limited to state regulation that can be varied by private contract.

**12.** *Cf.* Robert Wyman, SEC No-Action Letter, 1979 WL 14083 at *3 (June 13, 1979) ("[B]ecause of the complexity of financial options available to the broker-dealer, it would be difficult—and expensive—to calculate the extent of any

turn would undermine congressional objectives in creating an effective, uniform federal system of short sale and margin regulation, *see* 15 U.S.C. § 78b (Congress intended securities regulations to "remove impediments to ... a national market system for securities and a national system for the clearance and settlement of securities transactions"), and would undermine the SEC policy of relying on competition to determine the economics of broker-client relationships, *see, e.g.*, Robert Wyman, SEC No–Action Letter, 1979 WL 14083 at *4 (June 13, 1979) ("The federal securities laws frequently rely on fostering competition—rather than the imposition of more direct forms of regulation—as a means of insuring that broker-dealers offer their services at competitively reasonable prices to their customers.").

Third, the industry practices challenged here have existed for at least most of this century and pre-date the federal statutes and regulations described above. The fact that Congress, the SEC, and the Federal Reserve Board have imposed such detailed regulations on short sales and on the use of margin without requiring brokers to pay interest on collateral or otherwise segregate such funds easily supports the inference that federal law is intended to permit such practices. *See* note 6, supra; *cf.* 17 C.F.R. § 1.29 (expressly permitting merchants subject to CFTC regulation to retain interest on customer funds posted as collateral).

In view of the pervasive federal regulating scheme that explicitly permits brokers to commingle customer funds and implicitly permits them to retain earnings on collateral posted for short sales, the intrusion of Levitin's claim on the methods by which short sales and other margin transactions are undertaken, and the direct bearing of that claim on the very value of margin to brokers, we find that "Congress [has] left no room for the States to supplement" federal law. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).

▇▇▇ We need not address whether Levitin's alternative theory of ownership—

that a fiduciary duty between herself and PW entitles her to the profits realized from collateral—is preempted by federal law because it finds no support in New York law. Under New York law, "[a] broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities." *Perl v. Smith Barney Inc.*, 230 A.D.2d 664, 646 N.Y.S.2d 678, 680 (1st Dep't 1996) (finding no fiduciary duty governing broker/client relationship where broker allegedly overcharged fees in connection with nondiscretionary brokerage account (internal quotation marks omitted)). A fiduciary relationship arises "when one [person] is under a duty to act for or to give advice for the benefit of another within the scope of the relation." *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 599 (2d Cir.1991) (quoting *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (1987) (quoting Restatement (Second) of Torts § 874 cmt. a)); *see also Richardson Greenshields Securities, Inc. v. Mui–Hin Lau*, 693 F.Supp. 1445, 1456 (S.D.N.Y.1988) ("A broker who has discretionary powers over an account owes his client fiduciary duties."). Levitin has not alleged facts establishing such a fiduciary relationship and does not claim that PW's execution of short sales were discretionary acts on her behalf. Levitin's breach of fiduciary duty allegations therefore lack merit.

**E. Deception Regarding PW's Willingness to Negotiate Remittance of Earnings on Collateral**

Finally, we address Levitin's claims regarding the failure of PW to disclose that some large, favored customers are able to negotiate the partial remittance of earnings on collateral posted to secure short sales. There is a fatal defect in this claim, too.

▇▇▇ Levitin's complaint does not allege—and her brief does not purport to argue—that she is a large customer who might have negotiated a remittance. Indeed, the class she seeks to represent consists of all inves-

economic advantage attributable to the selection of a particular financing alternative in a specific

transaction").

tors who engaged in short sales through PW. She has not, therefore, alleged an individual injury from the alleged non-disclosure, and even less an *injury to the class of which she is a member*, given that even the large, favored investors negotiate remittances individually.

We do not address the issues that would arise if a plaintiff were to allege that she was a sufficiently large investor who, more probably than not, could have negotiated a remittance of one size or another had she known of the possibility. There is no such allegation here, and the individual issues of causation and measure of damages would make such an action an unlikely candidate for class certification.

### F. *Conclusion*

We therefore affirm. To the extent that our holding disposes of state claims based on an alleged state-law property right in the collateral securing Levitin's short sales, they are dismissed along with her federal claims. We affirm the district court's decision not to exercise jurisdiction over any remaining state law claims.