The NASDAQ STOCK MARKET, INC., Plaintiff,

v.

ARCHIPELAGO HOLDINGS, LLC, Archipelago Exchange, LLC, Pacific Exchange, Inc., and PCX Equities, Inc., Defendants.

No. 03 CV 8231(DLC).

United States District Court, S.D. New York.

Sept. 15, 2004.

Douglass B. Maynard, Abid Qureshi, Akin Gump Strauss Hauer & Feld, LLP, New York, New York, Cheryl A. Falvey, Karol A. Kepchar, Michael A. Oakes, Akin Gump Strauss Hauer & Feld, LLP, Mc-Lean, Virginia, for Plaintiff.

Andrew L. Deutsch, Piper Rudnick LLP, New York, New York, Monica L. Thompson, Piper Rudnick LLP, Chicago, Illinois, for Archipelago Defendants.

Susan J. Kohlmann, Rodney R. Peck, Carolina A. Fornos, Pillsbury Winthrop LLP, New York, New York, for Pacific Defendants.

Giovanni P. Prezioso, Jacob H. Stillman, John W. Avery, Meyer Eisenberg, Securities and Exchange Commission, Washington, D.C., for the Securities and Exchange Commission, Amicus Curiae.

*OPINION and ORDER*

COTE, Judge.

This action arises out of the facilitation of trading of the Nasdaq–100 Index Tracking Stock, known as QQQ shares, by Archipelago Exchange, LLC ("Arca Exchange") without a license from The Nasdaq Stock Market, Inc. ("Nasdaq"). The motions before this Court require a determination of whether Nasdaq retains a protectible property interest in QQQ shares once they are in the hands of investors, such that Nasdaq can require another exchange to obtain a license before investors are able to trade QQQ shares on that exchange.

On October 17, 2003 Nasdaq brought this suit against Archipelago Holdings, LLC ("Arca Holdings"), Arca Exchange (together, the "Arca Defendants"), Pacific Exchange, Inc. ("Pacific"), and PCX Equities, Inc. ("PCXE") (together, the "Pacific Defendants"), alleging unfair competition and false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a), and misappropriation, unfair competition, unjust enrichment, and intentional interference with prospective economic advantage in violation of the common law. Nasdaq seeks monetary damages and an injunction prohibiting defendants' facilitation of trading of QQQ shares without a license as well as defendants' use of the Nasdaq and QQQ trademarks in advertising that is false, misleading, or likely to cause confusion.

The Arca and Pacific Defendants filed motions to dismiss on November 18 and November 25, respectively. On March 24, 2004, this Court sent a letter (the "March 24 Letter") to the Securities and Exchange Commission ("SEC"), inviting it to comment on defendants' contentions that Nasdaq's claims are preempted by federal securities laws and SEC rules implementing a national market system ("NMS") and by the Unlisted Trading Privileges Act of 1994, codified at 15 U.S.C. § 78*l*(f) (the "UTP Act"), and that the SEC has already approved licensing practices similar to those in this action. The SEC submitted an *amicus curiae* brief on July 6 ("Amicus Brief"), and the defendants filed a response on July 30. For the following reasons, the defendants' motions to dismiss the common law claims are granted and the motions to dismiss the Lanham Act claims are denied.

### Background

The following facts are taken from the complaint, documents on which the complaint relies, and public records.

### Nasdaq and the QQQ Product

Nasdaq develops, operates, and maintains securities markets, and provides ancillary products and services. The Nasdaq Stock Market is the largest electronic, screen-based market in the world. Nasdaq services enable securities firms to execute transactions in The Nasdaq Stock Market from their own locations, relying on real-time trade reporting and automated market surveillance. Nasdaq competes for listings with other primary exchanges such as the New York Stock Exchange. Nasdaq also competes with regional exchanges like Pacific for a market share of transactions in Nasdaq-listed securities.

NASDAQ is a registered trademark employed by Nasdaq since 1968 in connection with the provision of securities information and trading support services associated with The Nasdaq Stock Market. Nasdaq developed The Nasdaq–100 Index (the "Index"), a widely-followed stock index comprised of the 100 largest non-financial companies listed on The Nasdaq Stock Market. The Index is generally perceived as a valuable indicator of broader market performance, which has led to the creation of numerous investment products that attempt to track its operation. The Nasdaq Stock Market is the only stock market or exchange to create and maintain a leading financial index.

In 1999, Nasdaq launched an exchange-traded fund ("ETF")—an investment product offering purchasers a transferable share that represents an investment in the portfolio of securities held and managed by the fund—based on the Index. The ETF, which trades under the ticker symbol QQQ (the "QQQ Product"), is sponsored by Nasdaq Financial Products Services, Inc. ("Nasdaq Products"), a wholly-owned subsidiary of Nasdaq. A licensing agreement

between Nasdaq and Nasdaq Products[1] provides that the latter is licensed to use the Index as the basis of the QQQ Product and that

> During the Life of this Agreement, no further Consent of Nasdaq need be obtained for use of the Index or Marks by any syndicator or underwriter of an offering of the [QQQ Product], *or for any secondary or other resale of the [QQQ Product]*, provided such secondary or other resale, syndication, or underwriting is legal under applicable law.

(Emphasis supplied.)

A share of the QQQ Product represents an investment in the Nasdaq–100 Trust, a unit investment trust that holds shares of the companies in the Index. The value of the QQQ Product is designed to track closely the price and yield performance of the Index. The Prospectus for the QQQ Product states that QQQ shares are "bought and sold in the secondary market like ordinary shares of stock."

Nasdaq states that it has spent $58 million promoting and advertising the QQQ Product since 1999. Nasdaq claims that the proprietary nature and commercial value of the QQQ Product derive from Nasdaq's intellectual property embodied in the Index and from its continued efforts to maintain the Index. Nasdaq earns an annual fee from Nasdaq Products and derives revenue from licensing arrangements for the trading of the QQQ Product.

*Defendants' Facilitation of QQQ Trading*

PCXE is a wholly-owned subsidiary of Pacific, a nationally-registered securities exchange. ArcaEx was first formed in 1999 as an electronic communications and equities trading facility to replace the traditional, physical trading floor for PCXE.

ArcaEx is operated by Arca Exchange, a wholly-owned subsidiary of Arca Holdings, in which Pacific owns an interest.

On October 25, 2001, the SEC approved Pacific's proposal to establish ArcaEx as the new electronic trading facility of PCXE. As part of the regulatory approval process, the books, records, premises, officers, directors, agents and employees of Arca Exchange were deemed to be those of Pacific and PCXE for the purposes of and subject to oversight pursuant to the Securities Exchange Act. Nasdaq alleges that the Pacific Defendants exercise operational control over ArcaEx and that Pacific has delegated to PCXE oversight of the operation of the ArcaEx trading facility.

In March 2002, ArcaEx began trading Pacific's primary listings, and by August all listed stocks were transferred to ArcaEx's exchange platform. The same month, Pacific cancelled its license to trade the QQQ Product. Pacific continues to facilitate the trading of QQQ shares on ArcaEx, and the QQQ Product is now its most actively traded product by volume. Nasdaq alleges that since the beginning of 2003, the market share of QQQ Product that trades on ArcaEx has increased by more than twenty-five percent. Nasdaq states that Pacific is the only exchange that has refused to obtain a license to trade the QQQ Product, thereby gaining an unfair advantage over other, licensed exchanges. Nasdaq further claims that Pacific trades other ETFs, including Standard & Poor's SPDR product and Dow Jones' Diamonds product, pursuant to licenses with the products' index providers.

*Defendants' Advertising*

Nasdaq alleges that defendants' use of the QQQ and NASDAQ marks[2] in adver-

---

1. The licensing agreement, entitled "Agreement for the Nasdaq–100 Index," was filed with the SEC on March 9, 1999.

2. Nasdaq's application to register the QQQ trademark is currently pending.

tising and promotional materials for ArcaEx and its trading services is likely to cause the public to believe erroneously that defendants' services are endorsed by Nasdaq or that the parties are affiliated. Specifically, Nasdaq objects to three of defendants' advertisements employing the QQQ or Nasdaq marks.

The first advertisement states prominently "We've Got QQQ Out the Wazoo" and, in smaller font at the bottom of the page, "# 1 Exchange for ETFs." Nasdaq argues that these statements, taken together, imply that ArcaEx has the greatest trading volume of the QQQ Product and that this claim is material because higher trading volume suggests more efficient pricing of the shares traded.

Second, Nasdaq objects to an advertisement that states prominently "There Goes That Home–Court Advantage Theory" and, again in smaller font at the bottom of the page, "# 1 Exchange for Trading Nasdaq Stocks." Nasdaq contends that these statements, alone and in conjunction with the first advertisement, also falsely imply that ArcaEx has the greatest trading volume of the QQQ Product.

The third advertisement features a picture of two rows of cans labeled "Exchange Traded Funds," the first also labeled SPY[3] and the second QQQ. Each of the cans is affixed with a different price tag. Underneath the photograph is the slogan "It's a Market. Of Course You Should Comparison Shop." followed by a paragraph of text reading

> At Archipelago, it's possible for you to set the best bid and offer in ETFs. Ever since we became represented in the National Market System through our link with The Nasdaq Intermarket, more and more traders have discovered the advan-

tages of trading ETFs on Archipelago. In addition to having the ability to set the best bid and offer, your trade will be anonymous and handled in a fair and consistent manner. There's never been a better reason to check out Archipelago.

Nasdaq claims that these statements falsely imply that defendants are authorized by Nasdaq to trade the QQQ Product. Although this advertisement was created in 2000, when Archipelago was a member of the Nasdaq marketplace, Nasdaq alleges that the advertisement was available on the ArcaEx website in August 2003.

### The Claims

Nasdaq brings an unfair competition and false designation of origin claim under the Lanham Act to address the defendants' use of the QQQ and NASDAQ marks in advertising materials. Nasdaq asserts that the trading of the QQQ Product without a license from Nasdaq constitutes violations of the common law, specifically, misappropriation, unfair competition, unjust enrichment, and intentional interference with prospective economic advantage.

### Discussion

■ Rule 8(a) requires that a plaintiff provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a), Fed.R.Civ.P. A court may dismiss an action for failure to state a claim pursuant to Rule 12(b)(6) only if "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997) (citations omitted). In construing the complaint, the court must "accept all factual allegations in the com-

---

**3.** SPY is the ticker symbol for the SPDR product, an ETF based on the Standad & Poor's 500 Index.

plaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Id.* "Given the Federal Rules' simplified standard for pleading, a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

█ In addition to the pleadings, the court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (citation omitted). A court may take judicial notice of a public record pursuant to Rule 201(b), Fed.R.Evid. *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir.2000).

*Preemption of State Law and Lanham Act Claims*

The defendants argue that Nasdaq's state law and Lanham claims are preempted by the UTP Act. Nasdaq contends that there are no grounds for the preemption of its claims and that licensing fees similar to those at issue in this case have already been approved by the SEC. This Court invited the SEC to address these arguments.

█ The Supremacy Clause gives Congress the power to supersede state law. U.S. Const., Art. VI, cl. 2; *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 705 (2d Cir.1998). If a federal statute does not contain explicit language preempting state law, "courts must consider whether the federal statute's structure and purpose, or nonspecific statutory language, nonetheless reveal a clear, but implicit, preemptive intent." *Levitin*, 159 F.3d at 705 (citation omitted). Congress's intent to preempt state law may be inferred:

> (i) where the federal statute created a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, (ii) *where federal law is in irreconcilable conflict with state law*, (iii) where compliance with both statutes is a physical impossibility, or (iv) *where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.*

*Id.* (citation omitted) (emphasis supplied); *see also Crosby*, 530 U.S. at 372–73, 120 S.Ct. 2288; *Rondout Elec., Inc. v. New York State Dep't of Labor*, 335 F.3d 162, 166 (2d Cir.2003). The determination of whether state law stands as a sufficient obstacle to imply preemptive intent requires examination of the federal statute as a whole, including "its purpose and intended effects." *Crosby*, 530 U.S. at 373, 120 S.Ct. 2288.

█ When two federal statutes are alleged to conflict, repeal may be implied only when "the latter act covers the whole subject of the earlier one and is clearly intended as a substitute," or when "provisions in two statutes are in irreconcilable conflict." *Branch v. Smith*, 538 U.S. 254, 273, 123 S.Ct. 1429, 155 L.Ed.2d 407 (2003) (citation omitted). Generally, "repeals [of federal law] by implication are not favored." *Id.*

In 1975, Congress amended the Securities Exchange Act of 1934 (the "Exchange Act") to facilitate the establishment of a national market system for securities ("NMS"), finding that such a system is in the public interest and is an appropriate means to protect investors by assuring

(i) the *economically efficient execution of securities transactions;* (ii) *fair competition* among brokers and dealers, *among exchange markets* and markets other than exchange markets; (iii) the availability to brokers, dealers and investors of information with respect to quotations for and transactions in securities; (iv) the practicability of brokers executing investors' orders in the best market; and (v) an opportunity ... for investors' orders to be executed without the participation of a dealer.

15 U.S.C. § 78k–1(a)(1)(C) (emphasis supplied). Specifically, Congress determined that the "the linking of all markets for qualified securities through communication and data processing facilities" furthers these objectives. 15 U.S.C. § 78k–1(a)(1)(D). The SEC was granted broad, discretionary power to oversee the development of the NMS and to adopt rules necessary for its implementation. 15 U.S.C. § 78k–1(a)(2). In order to be registered as a national securities exchange, the SEC must determine that the rules of the exchange are designed to "remove impediments to and perfect the mechanism of a free and open market and a national market system." 15 U.S.C. § 78f(b)(5).

Congress's enactment of the UTP Act in 1994 again amended the Exchange Act to promote the development of the NMS. The UTP Act provides that any national security exchange may immediately extend unlisted trading privileges ("UTP"), *i.e.,* allow trading in a security that is not listed or registered on that exchange, to a security listed on another exchange, other than an initial public offering. 15 U.S.C. § 78*l*(f); *see* Unlisted Trading Privileges Rule, 17 C.F.R. Part 240 (2000), 2000 WL 1224672, at *1 (describing the UTP Act). The UTP Act eliminated the requirement that an exchange apply to the SEC for approval before extending UTP to a given security. 2000 WL 1224672, at *1.

The SEC states that it has not considered the propriety of charging licensing fees to trade ETFs and has not approved such fees.[4] In response to this Court's March 24 Letter, the SEC opines that the facts of this case do not present grounds to find the implied preemption of Nasdaq's state law or Lanham Act claims. The Amicus Brief argues that there is no apparent conflict between the protection of intellectual property rights under state law and the objectives of the NMS—promoting economically efficient securities markets, fair competition, and execution of investors' orders in the best market—and therefore no basis for implied preemption of Nasdaq's state law claims absent SEC rulemaking in this area. The Amicus Brief similarly contends that no conflict exists between the UTP Act's purpose of encouraging competition among exchanges through unlisted trading privileges and state laws protecting the holders of intellectual property. The SEC suggests that its position would be subject to change upon a showing that the fees charged by Nasdaq have an adverse effect on one of the identified objectives of the Exchange Act, including ArcaEx's ability to compete for trading.

With respect to federal claims under the Lanham Act, the SEC notes that it has not engaged in any regulation of advertising by securities exchanges. The Amicus Brief argues that there is no conflict between a statutory scheme protecting intellectual property rights by prohibiting false advertising and the use of trademarks in a manner likely to mislead consumers and the NMS and UTP Acts. The SEC conse-

---

4. The parties had disputed, *inter alia,* whether the SEC's publication of notices of proposed rule changes filed by exchanges that sought to recoup license fees for the exchanges could be read as approval of licensing fees by the SEC.

quently rejects the defendants' arguments that Nasdaq's Lanham Act claims are preempted and that the securities laws immunize the defendants' conduct to the extent that it gives rise to claims under the Lanham Act.

■ "[T]he decision as to whether, in a given set of circumstances, one statutory scheme supersedes the other is, in the end, to be made by the courts." *In re Stock Exchanges Options Trading Antitrust Litigation,* 317 F.3d 134, 149 (2d Cir.2003) (citing *Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 686, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975)). An informal position adopted by an agency during the course of litigation is entitled to the limited standard of deference articulated by the Supreme Court in *Skidmore v. Swift,* 323 U.S. 134, 139, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *In re New Times Securities Services, Inc.,* 371 F.3d 68, 82–83 (2d Cir. 2004); *see also Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York,* 273 F.3d 481, 491 (2d Cir.2001). Under *Skidmore,* the level of deference "depends upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *In re New Times,* 371 F.3d at 83 (citation omitted); *see also Coke v. Long Island Care at Home, Ltd.,* 376 F.3d 118, 133 (2d Cir.2004).

■ The SEC does not squarely address the argument that requiring a national securities exchange to pay a licensing fee before listing a security is analogous to requiring an exchange to obtain permission to extend UTP to a given security. The UTP Act authorizes the extension of UTP by any national securities exchange to an equity security listed on another exchange, without obtaining the consent of the listing exchange. A listing exchange requiring another national securities exchange to receive its permission in order to extend UTP to an equity security would appear to violate the UTP Act. The requirement that another exchange pay a licensing fee prior to extending UTP is another means of preventing the extension of UTP absent the consent of the listing exchange. Licensing fees such as those charged by Nasdaq therefore appear to conflict with the UTP Act's immediate extension of UTP to facilitate the nationwide trading of securities. This apparent conflict exists independent of any demonstration by ArcaEx that Nasdaq's licensing fees have injured its ability to compete as a securities trading market.

At the same time, it is undisputed that the QQQ Product is a valuable product for consumers seeking to invest in the securities markets. There may be valid grounds for distinguishing exchange-created products from all other securities traded on an exchange. ETFs such as the QQQ Product enable investors to obtain a share of a portfolio representing all of the securities held by a fund, diversifying their investment and minimizing risks associated with volatile markets. *See, e.g.,* Order Approving Proposed Rule Changes Relating to the Listing and Trading of Index Participations, Exchange Act Release No. 26,709 (April 11, 1989), 1989 SEC LEXIS 679, at 60–61, 70. Nasdaq argues that without the licensing fees that it charges exchanges to trade the QQQ Product, it and other exchanges will have little incentive to develop similar index-based investment products for consumers. A doctrine that stifles the innovation of ETFs and other investment products that similarly facilitate consumer investment in the securities markets while minimizing risks associated with market volatility may conflict with objectives of the securities laws independent of those of the UTP Act. Were Nasdaq to demonstrate the existence of such a

conflict and an unreasonable burden on developing or maintaining the QQQ Product absent licensing fees, there may be grounds to find that the enforcement of Nasdaq's claims would be consistent with the federal securities laws, although in apparent tension with the UTP Act. It is premature, therefore, to make a determination as to whether Nasdaq's state law claims, which seek to impose a licensing fee for the defendants' trading of the QQQ Product, are preempted by the UTP Act.

■ Insofar as the defendants' advertisements are concerned, the SEC argues persuasively that no conflict exists in this action between the enforcement of the Lanham Act's prohibition of false advertising and trademark infringement and the UTP Act and securities laws implementing the NMS. Nasdaq alleges that defendants' advertising is false and misleading to consumers and therefore infringes its rights as the holder of intellectual property in the NASDAQ and QQQ marks. There is no basis to find that the securities laws immunize defendants against claims such as these brought pursuant to the Lanham Act.

*Common Law Claims*

■ The question that underlies each of the common law causes of action is whether Nasdaq has the type of interest in the QQQ Product that is capable of being protected by a license. This is a legal question that is capable of resolution on a motion to dismiss.

While Nasdaq emphasizes its investment in the creation of the Index, the defendants have not copied the Index or created a product—such as a futures contract— that is linked to the Index. Nasdaq's reliance on *Standard & Poor's Corp. v. Com-*

*modity Exchange, Inc.,* 683 F.2d 704 (2d Cir.1982), and *Board of Trade v. Dow Jones & Co.,* 98 Ill.2d 109, 74 Ill.Dec. 582, 456 N.E.2d 84 (1983), is therefore misplaced.[5] The function that the defendants perform, and for which Nasdaq demands a licensing fee, is the listing of the QQQ Product on its exchange so that investors who desire to sell their QQQ shares or to buy QQQ shares from other investors may do so on ArcaEx. Nasdaq has not explained how this activity differs in any material way from that addressed in *Golden Nugget, Inc. v. American Stock Exchange, Inc.,* 828 F.2d 586 (9th Cir.1987), where the Ninth Circuit held that Golden Nugget had no protectible interest in the common stock owned by its shareholders that would permit it to control which exchange served as a market place for the resale of those shares.

Nasdaq makes the following arguments in an effort to distinguish QQQ shares from other securities traded on ArcaEx. It asserts that prices in the secondary market for QQQ shares cannot be set without reference to the Index. That is certainly so, but the Index is publicly available information and those who use it to set the price for the QQQ shares they trade are investors and not the defendants. Nasdaq also argues that ArcaEx profits from the trading in QQQ shares. While that is assumed to be so, those profits come from providing a marketplace for the trading of shares and not from any direct or improper use of the Index. Finally, Nasdaq points out that other exchanges have paid licensing fees in order to list the QQQ shares for trading. The actions of these exchanges do not create a property right where none exists. Since Nasdaq has no protectible property interest in the

---

**5.** It is worth noting, moreover, that the Second Circuit's holding in *Standard & Poor's* is limited to the finding that the public interest justified upholding the issuance of a preliminary injunction preserving the status quo until the intellectual property claims could be resolved on their merits. *Standard & Poor's,* 683 F.2d at 712.

QQQ shares held by investors, and since each of its common law claims is premised on such an interest, those claims must be dismissed.

*Lanham Act Claims*

 Nasdaq brings claims for trademark infringement and false advertising under the Lanham Act, which provides a civil right of action for

[a]ny person who, on or in connection with any goods and services, ... uses in commerce any word, term, symbol, name or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) *is likely to cause confusion*, or to cause mistake, or to deceive as to affiliation, connection or association of such person with another person, or *as to the origin, sponsorship or approval of his or her goods, services or commercial activities by another person*, or

(B) *in commercial advertising or promotion, misrepresents the nature, characteristics, qualities*, or geographic origin *of his or her or another person's goods, services or commercial activities*
. . . .

15 U.S.C. § 1125(a) ("Section 1125(a)") (emphasis supplied). Section 1125(a) is a broad federal unfair competition provision designed to protect unregistered trademarks by preventing "consumer confusion regarding a product's source or sponsorship." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir.2002). To establish a claim for trademark infringement based on false representation of origin, a

plaintiff must allege that its trademark is valid and eligible for protection, and that as a result of a defendant's use of the mark there is the "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 61 (2d Cir. 2000). Whether there is a likelihood of confusion is measured by an eight-factor, fact-intensive test set forth in Judge Friendly's landmark decision *Polaroid Corp. v. Polarad Electronics, Corp.*, 287 F.2d 492, 495 (2d Cir.1961). *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 130 (2d Cir.2004).

 A defendant's use of a plaintiff's mark to describe the plaintiff's product is considered nominative, non-infringing use if three requirements are met. *New Kids on the Block v. News Am. Pbl'g, Inc.*, 971 F.2d 302, 308 (9th Cir.1992); *see also EMI Catalogue*, 228 F.3d at 65. "First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *New Kids*, 971 F.2d at 308. It is generally inappropriate to dismiss a Lanham Act claim on grounds of nominative use without considering the pattern of infringing conduct alleged in the complaint. *Chambers*, 282 F.3d at 156.[6]

---

6. Defendants also claim that they are not liable for trademark infringement because they are acting as resellers of genuine goods bearing a true mark. Generally, distributors who resell trademarked goods are not liable for infringement. *Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 62 (2d Cir.1992). When the resale and associated promotion of

the goods is likely to cause confusion as to the goods' origin, however, infringement may be found. A defendant may not prevail on this defense, like the nominative use defense, when the plaintiff alleges that the defendant's use of the mark is likely to cause confusion as

■ To state a claim for false advertising, a plaintiff must allege "either that the challenged advertisement is literally false, or, although literally true, that it is still likely to mislead or confuse consumers." *L & F Products v. Procter & Gamble Co.*, 45 F.3d 709, 711 (2d Cir.1995); *see also Johnson & Johnson * Merck Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir.1992). If an implied falsehood is at issue, it is the perception of the relevant public, not the court, that determines whether an advertisement is misleading. *Johnson & Johnson*, 960 F.2d at 298. Claims that cannot be proven true or false are not actionable under the Lanham Act, but implicit comparisons may give rise to a trademark violation. *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir.1995).

■ Although Nasdaq's Lanham Act claims appear weak, they satisfy the liberal pleading requirements of Rule 8, Fed. R.Civ.P. Nasdaq alleges that defendants' advertising and promotional campaign is likely to cause the relevant public to be misled as to the sponsorship or affiliation of defendants' services by Nasdaq and that the advertisements include implied falsehoods likely to mislead the public. Defendants' nominative use defense requires evaluation of whether their use of Nasdaq's marks suggests sponsorship or affiliation in the minds of the relevant purchasers—an analysis based on a factual inquiry inappropriate on a motion to dismiss. Defendants' puffery defense also necessitates a fact-specific determination of whether the advertisements at issue contain an implied falsehood sufficiently specific to mislead the relevant consumers. Any determination at this stage in the proceedings, moreover, would fail to address Nasdaq's allegation that defendants have engaged in other promotional activities in violation of the Lanham Act.

to the sponsorship or endorsement of the use

*Liability of the Pacific Defendants*

■ The Pacific Defendants argue that Nasdaq's claims against them for violations of the Lanham Act are insufficient as a matter of law. Nasdaq has alleged that Pacific has operational control of ArcaEx and that Pacific has delegated oversight of ArcaEx to PCXE. These allegations are sufficient under Rule 8(a), Fed.R.Civ.P., to state a claim against the Pacific Defendants for their involvement in the promotion and advertising of ArcaEx's facilitation of trading of the QQQ Product.

*Conclusion*

The defendants' motions to dismiss are granted with respect to Nasdaq's common law claims and denied with respect to Nasdaq's claims under the Lanham Act.

SO ORDERED.

by the trademark holder.